May 26, 2021

**Supreme Court**

No. 2019-318-C.A.
(P1/15-3840BG)

State      :

 v.      :

Reginald Isom.    :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                          :

v.                             :

Reginald Isom.                 :

Present: Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

## O P I N I O N

**Chief Justice Suttell, for the Court.**   The issues in this appeal arise from a robbery and the resulting exchange of gunshots.   A jury convicted the defendant, Reginald Isom, on eight criminal counts related to the robbery.   The defendant now appeals from the judgment of conviction and commitment.  He contends that the trial justice erred by refusing to include the withdrawal exception to the initial aggressor rule in his jury instructions on self-defense and by denying the defendant's motions for a bill of particulars and to compel a bill of particulars.

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

# I

## Facts and Travel[1]

On the morning of October 23, 2015, defendant knocked on the window of his friend Leroy Dorsey's house in Providence, and, according to Dorsey, the two "just sparked up a conversation." Their discussion concerned the potential commission of a robbery of a pawnshop on Smith Hill. At the time, defendant was living in the back of a nonfunctioning pickup truck owned by Dorsey's grandfather. The defendant was homeless and had dropped out of high school in his final semester. The defendant suggested that Dorsey "open the door and be a look-out" during the robbery. Dorsey agreed, and the pair went across the street to enlist their acquaintance, Andrew McLean, who had previously discussed the robbery with defendant. The group further discussed committing the robbery together. McLean, armed with a gun, then drove the three men to the pawnshop, Capital Gold, on Smith Street in Providence.

The targeted pawnshop was owned by Justin Kemp. To enter the door of Capital Gold, one had to be buzzed in. Once the door closed, it locked automatically, and customers had to be buzzed back out to exit. The store was separated into two

---

[1] We recite the facts in narrative form. The essential facts are not disputed; indeed, virtually the entire robbery was captured on security footage.

parts; the front section was separated from the back section by bulletproof glass and a half-door.

When the trio arrived at Capital Gold at approximately 10:22 a.m., Dorsey buzzed the door and the door was unlocked for him. As they walked in—with Dorsey in front—defendant put gloves on and McLean brandished his weapon. Kemp took out his own gun and pointed it at the three men. Dorsey, who had apparently missed his assignment to hold the front door open, had allowed it to shut behind them. Dorsey raced towards the now-locked door with his hands up, running into McLean and knocking the gun out of his hand. The defendant and McLean then also ran towards the locked door, putting their hands up as they attempted to flee. Dorsey recalled that Kemp then stated, "I should * * * kill you guys," while his gun was pointed at them.

When McLean began looking through the items on the ground where his gun had fallen, Kemp, still holding his gun, approached the men and grabbed McLean by the front of his sweatshirt. The defendant then jumped on Kemp's back and attempted to wrestle the gun away from him, while also swinging a pocketknife at Kemp. At some point during the scuffle, Dorsey was shot in the leg, and he retreated to the back of the pawnshop. McLean was shot in the stomach. Dorsey then returned to the front of the pawnshop and assisted defendant in wrestling with Kemp. Meanwhile, McLean searched the ground for his gun; when he located it, he

approached Kemp—who was still wrestling with the other two men—and shot him in the head.

The defendant then picked up Kemp's gun, briefly pointed it towards Kemp's body lying on the ground, and then placed it on a nearby stool. The defendant grabbed Kemp's cell phone and placed it in his pocket. Dorsey then grabbed McLean's gun, and defendant buzzed Dorsey out so he could exit the building.

The defendant next attempted to find video footage and destroy it by pulling down a monitor connected to the cameras. The defendant also turned Kemp's body over; Kemp was then lying face-up on the ground, surrounded by a pool of his own blood. At this time, defendant began to look for his own wallet and pocketknife. Eventually, defendant left with McLean, who had gathered several items from around the pawnshop, including two laptops. This entire event lasted approximately four minutes; Kemp was shot approximately fifty-three seconds after the trio entered the pawnshop.

Vincent Ritter, a letter carrier for the United States Postal Service, was delivering mail on foot in the proximity of Capital Gold. While delivering mail across the street from Capital Gold, Ritter heard approximately five loud bangs, which seemed to come from inside Capital Gold. Ritter continued his deliveries and crossed to the side of the street on which Capital Gold was located. As Ritter approached the curb, he observed a young man, later identified as Dorsey, exiting

Capital Gold. Ritter asked Dorsey if "everything [was] okay in there[,]" to which Dorsey responded, "Yes sir, everything is fine." Dorsey then went down a nearby street and tossed the gun.

After Ritter observed Dorsey walking away, he attempted to make a delivery at Capital Gold. Ritter rang the buzzer at Capital Gold and then looked into the window, where he observed Kemp lying in a puddle of blood. Ritter then ran in the direction of his truck—where he had left his phone—stopping a vehicle on his way and asking the motorist to call 911. When Ritter reached his mail truck, he also called 911.

At some point after Ritter called 911, police officers arrived at the scene and observed Kemp lying on the floor inside Capital Gold. The officers requested a fire engine to respond to the scene to effectuate a forced entry, which they did using a master key. Kemp was subsequently transported to Rhode Island Hospital. Providence police officers continued their investigation at the scene, which included extracting video footage from Capital Gold's surveillance system. Officers also responded to a separate location, less than a block away, where a firearm was discovered in a driveway.

Ritter spoke to Detective Jay Simoneau of the Providence Police Department at the scene. Detective Simoneau brought Ritter to a residence about a block away on Ayrault Street, where officers had a suspect in custody. Ritter was shown the

suspect, Dorsey, sitting on a side-step of the house; Ritter recognized him as the man he had observed walking out of Capital Gold.

Dorsey was taken to the hospital to treat his gunshot wound, and later to the police station to be questioned. At the police station, Dorsey identified photographs of defendant and McLean as the men who were present at Capital Gold with him. That same day, at 1:38 p.m., McLean was also apprehended. Because McLean had a gunshot wound to his stomach, he was first taken to the hospital.

On July 20, 2016, Dorsey pled guilty to charges of first-degree robbery, conspiracy, discharging a firearm, and felony assault, for which he was sentenced to thirty years to serve at the Adult Correctional Institutions, followed by twenty years of probation. McLean also pled guilty to charges of first-degree robbery, conspiracy, discharging a firearm, felony assault, and carrying a pistol without a license, for which he was sentenced to forty years to serve at the ACI, followed by twenty years of probation.

On November 24, 2015, an indictment was filed against defendant. On December 9, 2016, defendant was identified in an unrelated investigation in Pennsylvania. After defendant gave Pennsylvania officers several false names and birth dates, they ran defendant's fingerprints, which came back with a "hit" for a warrant in Providence, Rhode Island, related to the robbery of Capital Gold.

## A

## Pretrial Motion

Prior to trial, defendant filed a motion for a bill of particulars requesting information on each count, regarding: "[t]he exact location of the alleged offense"; "[t]he precise time of day that the offense was allegedly committed"; "[t]he manner and means by which the alleged offense was committed"; "[a] detailed statement of the factual information upon which the State will rely * * *"; and "any information in the prosecutor's files * * * which establishes * * * the existence of any element of any of the alleged charges." The state responded that the relevant facts were contained in their discovery response in the case, which, the state argued, satisfied the bill of particulars. The defendant then moved to compel the state to answer his motion for a bill of particulars. The defendant argued both of these motions in front of the trial justice on June 4, 2018, before the start of trial. However, the trial justice determined that "where the State has provided ample discovery and the indictment contains specific allegations, a bill of particulars is not appropriate." Accordingly, the trial justice denied the motions.

## B

## The Trial

The defendant's trial occurred over six days in June 2018. In exchange for a letter to the parole board, Dorsey testified at defendant's trial. Due to the severity

of injuries sustained, Kemp could not remember anything that happened on October 23, 2015, and did not testify to these events; however, he testified as to his injuries and regarding the pawnshop more generally. Ritter and several police officers testified regarding what they saw that day. The defendant also testified in his own defense.

At the conclusion of the trial, defendant requested a self-defense instruction "with regard to the felonious assault, the possession of a handgun as a felony, the discharge of a handgun during a crime of violence, and possession without a license." The state objected to the self-defense instruction, specifically focusing on defendant's proposed instruction regarding a withdrawal exception to the so-called "initial aggressor rule" and stating that there had been no "good-faith withdrawal" in this case. The trial justice ultimately agreed to give a self-defense instruction, stating that "[y]ou don't need much" to get such an instruction. However, he refused to "give the withdrawal instruction[.]" The trial justice gave the self-defense instruction only with respect to the charges of assault with a dangerous weapon and discharge of a firearm during a crime of violence. That self-defense instruction stated, in part:

> "The law of self-defense holds that a person may defend himself whenever he reasonably believes that he is in imminent danger of bodily harm from another. A person harboring such a reasonable fear need not wait for the other person to strike first. However, such a person must

- 8 -

use only such force as is reasonably necessary under all the circumstances to protect himself.

"* * *

"Although the State is obliged to negate the claim of self-defense beyond a reasonable doubt, you must also bear in mind that a defendant may not invoke the doctrine of self-defense if he has instigated the combative confrontation or has knowingly assisted in creating this occurrence.

"Self-defense is based on necessity, and a defendant is not entitled or permitted to provoke a difficulty, thereby creating necessity, and then attempt to justify his conduct as an act of self-defense."

After deliberations, the jury found defendant guilty of first-degree robbery of Kemp (count one); conspiracy to commit robbery (count two); discharging a firearm during a crime of violence, namely, robbery or attempted robbery resulting in injury to Kemp (count three); assaulting Kemp with a dangerous weapon (count four); unlawfully possessing a pistol without a license as to both McLean's gun and Kemp's gun (counts five and seven); and unlawfully possessing a pistol after previously being convicted of a felony, as to both guns (counts six and eight).

At sentencing, the trial justice noted that defendant was also adjudged a probation violator as to three other cases and ordered defendant to serve sixty-six months in each case. As to the case at bar, defendant was sentenced to a life sentence as to count one; ten years suspended, with probation, concurrent with the life sentence, as to count two; twenty years without parole with ten years to serve,

consecutive to the life sentence, as to count three; twenty years to serve, concurrent with the life sentence, as to count four; ten years suspended, with probation, consecutive to the count three sentence, as to count five; ten years to serve, concurrent with the life sentence, as to count six; ten years suspended, with probation, consecutive to the count three sentence, as to count seven; and ten years to serve, concurrent with the life sentence, as to count eight. The previously suspended probationary time was to be served concurrently with the new sentence imposed.

A judgment of conviction was entered on January 15, 2019. The defendant filed a timely notice of appeal on January 22, 2019.

## II

## Discussion

## A

## Jury Instructions

The defendant argues that the trial justice committed reversible error in refusing to instruct the jury about the withdrawal exception to the initial aggressor rule as it relates to the self-defense instruction. The defendant contends that he surrendered in good faith to Kemp, communicated that to Kemp, and was still confronted by deadly force. The state replies that the withdrawal exception is not

recognized in Rhode Island, and that, even if it were, the exception is not applicable here.

**1**

**Standard of Review**

This Court reviews "jury instructions on a *de novo* basis." *State v. Ros*, 973 A.2d 1148, 1166 (R.I. 2009). "It is well established that, 'on review, we examine jury instructions in their entirety to ascertain the manner in which a jury of ordinary intelligent lay people would have understood them.'" *Id.* (brackets omitted) (quoting *State v. Ibrahim*, 862 A.2d 787, 796 (R.I. 2004)). "This Court will not examine a single sentence apart from the rest of the instructions, but rather the challenged portions must be examined in the context in which they were rendered." *Id.* (brackets omitted) (quoting *Ibrahim*, 862 A.2d at 796). "A trial justice's refusal to grant a request for jury instruction is not reversible error if the requested charge is fairly covered in the general charge." *State v. Hallenbeck*, 878 A.2d 992, 1008 (R.I. 2005) (brackets omitted) (quoting *State v. Lynch*, 854 A.2d 1022, 1044 (R.I. 2004)).

"Pursuant to G.L. 1956 § 8-2-38, 'we determine whether the jury charge sufficiently addresses the requested instructions and correctly states the applicable law.'" *Ros*, 973 A.2d at 1166 (quoting *State v. Graham*, 941 A.2d 848, 855 (R.I. 2008)). "In so doing, we examine the record in a light most favorable to the

defendant." *State v. Soler*, 140 A.3d 755, 759-60 (R.I. 2016) (quoting *State v. Pineda*, 13 A.3d 623, 631 (R.I. 2011)).

## 2

## The Withdrawal Exception

In regard to a self-defense instruction, "we have held that a trial justice is obligated to give a proposed instruction on self-defense 'regardless of how slight and tenuous the evidence may be on which the self-defense hypothesis is advanced.'" *State v. Martin*, 68 A.3d 467, 474 (R.I. 2013) (quoting *State v. Linde*, 876 A.2d 1115, 1130 (R.I. 2005)). However, "we have affirmed a trial justice's refusal to give a proposed instruction where there was an 'incongruent self-defense theory proffered by the defendant to the trial justice and a dearth of evidence applicable to a properly articulated theory.'" *Id.* (brackets omitted) (quoting *Pineda*, 13 A.3d at 634).

"In fact, we have cautioned that an instruction that is unsupported by the evidence adduced at trial runs the risk of confusing or misleading the jury and thus should not be given." *Martin*, 68 A.3d at 474. "[W]e also have observed that 'one may not invoke the doctrine of self-defense if he or she has instigated the combative confrontation.'" *Linde*, 876 A.2d at 1130 (quoting *State v. Martinez*, 652 A.2d 958, 961 (R.I. 1995)). "Self-defense is grounded on necessity, and one cannot provoke a difficulty, thus creating the necessity, and then justify the resulting homicide or

- 12 -

injury as an act of necessity and self-defense." *Id.* (quoting *State v. Guillemet*, 430 A.2d 1066, 1069 (R.I. 1981)).

For the first time, this Court addresses the application of the withdrawal exception to the initial aggressor rule in relation to self-defense. The United States Supreme Court has said that, under certain circumstances, "[i]t should [be] submitted to the jury whether the act of the accused * * * was intended to be, and should have been reasonably interpreted as being, a withdrawal by the accused in good faith from further controversy[.]" *Rowe v. United States*, 164 U.S. 546, 554-55 (1896). Other jurisdictions have outlined the test to determine whether the withdrawal exception is appropriate. "[T]he doctrine of communicated withdrawal may not be invoked unless the aggressor's intent to withdraw is clearly made known to his victim." *State v. Diggs*, 592 A.2d 949, 951 (Conn. 1991). In other words, "[o]nly in the event that he communicates to his adversary his intent to withdraw and in good faith attempts to do so is he restored to his right of self-defense." *United States v. Desinor*, 525 F.3d 193, 198-99 (2nd Cir. 2008) (quoting *United States v. Taylor*, 510 F.2d 1283, 1287 (D.C. Cir. 1975)).

The defendant argues that, in moving towards the door and putting his hands up, he clearly withdrew and communicated his withdrawal to Kemp, who continued to scream at the three men and point his gun at them. The state, on the other hand, notes the short time span of this event and that defendant moved to ultimately have

an advantage over Kemp, by jumping on his back, with merely fifty-three seconds elapsing between defendant's entrance into the store and Kemp getting shot.

We recognize that the trial justice carefully considered our past jurisprudence in providing a self-defense instruction in the case at bar. As stated *supra*, we have repeatedly cautioned the trial courts to "instruct the jury on self-defense regardless of how 'slight and tenuous the evidence may be on which the self-defense hypothesis is advanced.'" *Linde*, 876 A.2d at 1130 (quoting *State v. Butler*, 107 R.I. 489, 496, 268 A.2d 433, 436 (1970)). However, one must scour the videotape footage very carefully to detect even a scintilla of evidence that defendant was entitled to a self-defense instruction. There is no question that defendant, entering the pawnshop with others who were armed to rob it, was the initial aggressor here; defendant does not dispute this. Therefore, his only remaining avenue under a self-defense theory was through the application of the withdrawal exception, which has never been adopted in this jurisdiction.

Even if this Court were to adopt the withdrawal exception to the initial aggressor rule, we do not find that defendant satisfied the requirements under that exception as a matter of law. Under such a theory, defendant had to show not only that he had withdrawn, but also that the dangerous situation that he and his companions had created had dissipated. *See Desinor*, 525 F.3d at 199. We first note that any evidence that defendant had withdrawn was tenuous; defendant had his

hands up for less than thirty seconds, and, at his first opportunity, got behind Kemp and attacked him. However, even if defendant had presented evidence that he had withdrawn, which we do not find, he presented no evidence that the robbery dissipated. In fact, after Kemp was shot, defendant and McLean continued on with the robbery, collecting various items from the pawnshop. Accordingly, defendant did not present sufficient evidence to warrant a jury instruction on the withdrawal exception.

Thus, it is clear to us that the trial justice was decidedly generous in giving an instruction on self-defense. We are convinced, however, that defendant was not entitled to a jury instruction as to the withdrawal exception to the initial aggressor rule under a self-defense theory, an exception that we need not, and do not, adopt in the context of this case.

**B**

**Bill of Particulars**

The defendant additionally argues that the trial justice abused his discretion in denying defendant's motion for a bill of particulars and motion to compel such because two separate acts could have established the single count of assault with a dangerous weapon. The state responded that defendant was not entitled to a bill of particulars because the indictment was sufficiently worded to provide adequate notice to defendant.

- 15 -

Rule 7(f) of the Superior Court Rules of Criminal Procedure provides:

> "Upon motion of a defendant the court shall direct the filing of a bill of particulars. A motion for a bill of particulars may be made within thirty (30) days after arraignment or at such later time as the court may permit. A bill of particulars may be amended at any time subject to such conditions as justice requires."

However, this Court has addressed situations where a bill of particulars was not presented. In *State v. Mollicone*, 654 A.2d 311 (R.I. 1995), we held:

> "Although Rule 7(f) is expressed in mandatory terms, we have noted * * * that 'the function of a bill of particulars is to provide the defendant with the factual detail omitted from an indictment or information. Its primary purpose is to supply the defendant with such particulars as are necessary in order that judicial surprise is avoided at trial.'" *Mollicone*, 654 A.2d at 325 (brackets omitted) (quoting *State v. Collins*, 543 A.2d 641, 654 (R.I. 1988)).

Further, we have recognized that "the granting of a bill of particulars in any civil or criminal proceeding is within the discretion of the justice who hears the motion and his [or her] discretion will not be disturbed unless it appears that there has been an abuse of discretion." *State v. Gregson*, 113 A.3d 393, 397 (R.I. 2015) (quoting *Union Mortgage Co. v. Rocheleau*, 51 R.I. 345, 348, 154 A. 658, 660 (1931)).

As to the indictment, the trial justice noted that it "is very specific with respect to the assault charge. It is a charge of assault with a dangerous weapon, namely, a firearm. The video has been provided to counsel[.]" He went on: "[W]here the State

- 16 -

has provided ample discovery and the indictment contains specific allegations, a bill of particulars is not appropriate." (Citing *Mollicone*, cited *supra*.)

We agree with the trial justice. Considering the specific allegations in the indictment and the discovery provided by the state—including the video of the entire encounter—we are of the opinion that the trial justice did not err in denying the motion for a bill of particulars and the subsequent motion to compel such, under the circumstances of the case.

## III

### Conclusion

For the reasons stated herein, the defendant's appeal is denied, and the judgment of the Superior Court is affirmed. The record shall be returned to the Superior Court.



## STATE OF RHODE ISLAND

### SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Reginald Isom. |
| **Case Number** | No. 2019-318-C.A. (P1/15-3840BG) |
| **Date Opinion Filed** | May 26, 2021 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Robert D. Krause |
| **Attorney(s) on Appeal** | For State:<br><br>Mariana E. Ormonde<br>Department of Attorney General<br>For Defendant:<br><br>Camille A. McKenna<br>Department of Attorney General |