USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT ____________________ No. 93-2044 UNITED STATES, Appellee, v. ROBERT O'CONNOR, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Robert E. Keeton, U.S. District Judge] ___________________ ____________________ Before Selya, Circuit Judge, _____________ Coffin and Bownes, Senior Circuit Judges. _____________________ ____________________ Deirdre Lee Thurber for appellant. ___________________ William P. Stimson, Assistant United States Attorney, with whom ___________________ Donald K. Stern, United States Attorney, was on brief for appellee. _______________ ____________________ June 22, 1994 ____________________ BOWNES, Senior Circuit Judge. Defendant Robert BOWNES, Senior Circuit Judge. _____________________ O'Connor and three others were indicted on eight counts charging violations of 18 U.S.C. 1343 (fraud by wire, radio, or television) and 18 U.S.C. 2 (Principals). The indictment alleged that the defendants and others had devised a scheme to defraud and obtain money by false pretenses, representations, and promises, and had made or caused to be made wire transmissions in interstate commerce in order to carry out the fraud. The three other defendants pled guilty prior to trial. Defendant opted for trial and was found guilty on all eight counts by a jury. This appeal followed.1 THE SCHEME THE SCHEME __________ In order to understand the issues on appeal a description of the scheme to defraud is necessary. The progenitors of the fraud were two real estate brokers, Barry and Diana Tevrow. Its purpose was to secure financing so individuals could purchase residential real estate without the necessity of making down payments. To effectuate this, the Tevrows engineered successive purchase and sale transactions of residential properties so as to inflate the ultimate purchase prices. Lenders would then be induced to advance loans for substantially more than the properties were actually worth. In order for the scheme to work, the Tevrows ____________________ 1. Appellate counsel for defendant was not trial counsel. -2- 2 had to persuade the buyer(s) to give false information on the loan application(s) anent their income and assets. This required that the Tevrows falsify documents, such as income tax withholding statements and bank statements, to support the false loan application. Defendant became part of the scheme because he was an experienced real estate appraiser. His role was to appraise the subject property at an amount that would convince the lender that the property had sufficient value as collateral to secure the loan. Defendant met with the Tevrows and they explained their scheme to him, which was to buy the property in the first instance through a straw and then immediately resell it at an inflated price. The inflated price was determined by adding to the initial price the following amounts: (1) $35,000; (2) any amount of cash up to $15,000 that the final purchaser wanted to receive at the closing; plus (3) 20% of (1) and (2).2 Defendant was told that he had to prepare appraisals that would "come in" at the price determined under the formula. It was agreed that defendant would be paid $1,000 for every successful closing in addition to his usual fee of $250-300 for the appraisal. Defendant was paid in ____________________ 2. We note the obvious, that the success of the fraud depended upon the Tevrows' obtaining buyers who were willing to submit false loan applications. -3- 3 cash or by money order; at times defendant's "cut" was deposited directly into his bank account. Defendant's experience as an appraiser did not extend to the North Shore area of Massachusetts. He overcame this deficiency by using Diana Tevrow, who was not a trained appraiser, to help him. She obtained a listing sheet prepared by the Multiple Listing Service for each property that was to be used. The listing sheet described the property and gave the seller's offering price. Tevrow also obtained a "field card" describing the property from the city hall in the locality in which the property was located. She took photos of the outside of the house and made a sketch of its interior. Tevrow had the further assignment of selecting "comparable sales" properties. This entailed choosing recently sold properties whose sales prices could be used as benchmarks to help establish the value of the property to be used in the fraud scheme. Tevrow was told by defendant to select "comparable sales properties" solely on the basis of price and not to worry about whether the properties were in fact comparable in location, appearance, structure, and size to the subject property. According to Tevrow, defendant changed the description of the subject property and the "comparable sales" properties so that it appeared that they were similar. -4- 4 No issue has been raised as to the sufficiency of the evidence. There are only two issues on appeal: the giving of a willful blindness instruction and sentencing. WILLFUL BLINDNESS WILLFUL BLINDNESS _________________ Defendant makes three claims on willful blindness. His first is that the "silence of the record regarding the Court's decision to charge willful blindness requires vacatur and remand." Defendant is claiming that there is no record showing that the district court complied with Fed. R. Crim. P. 303 by notifying defendant of its proposed action upon the ____________________ 3. Rule 30. Instructions Rule 30. Instructions At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. At the same time copies of such requests shall be furnished to all parties. The court shall inform ________________________ counsel of its proposed action upon the _________________________________________ requests prior to their arguments to the _________________________________________ jury. The court may instruct the jury _____ before or after the arguments are completed or at both times. No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection. Opportunity shall be given to make the objection out of the hearing of the jury, and on request of any party, out of the presence of the jury. (Emphasis ours.) -5- 5 requests for instructions, specifically the one on willful blindness, prior to the parties' arguments to the jury. This claim is decisively rejected by the record. There was a jury charge conference on March 9, two days prior to the submission of the case to the jury on March 11. At the conference a willful blindness instruction was discussed at length by the court and the parties. The discussion ended by the court informing the prosecutor that defendant objected to the willful blindness instruction as proposed by the court. Then followed this colloquy between the court and the prosecutor: MR. POVICH: Well, at this point in time I am not going -- I'm not going to fight his objection, but I reserve my right depending on how things go. THE COURT: All right. . . . I'll tell you what I'll do with it. If he puts on a case that causes you to want to request it, you'll let me know before I charge the jury and also give me the substitute language, either reinstating what I now have or whatever different language you want. On the next day, March 10, the court gave counsel a copy of its proposed jury charge. The proposed charge contained the same willful blindness instruction given to the jury the next day. The docket notes for March 11 show: "Colloquy re: draft of instructions on willful blindness. D objects to giving instruction but not to the specific form. -6- 6 Jury brought in. Govt & D present closing. Court charges the jury." The record establishes: that a willful blindness instruction was discussed at the jury charge conference on March 9; that a draft of the court's jury charge containing a willful blindness instruction was given to defendant's counsel on March 10; and that on March 11, defense counsel objected, prior to final argument, to giving the willful blindness instruction but not to its specific form. There was no violation by the district court of the requirement of Fed. R. Crim. P. 30 that, "[t]he court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury." Before getting to defendant's substantive objections to the willful blindness instruction, we first consider the government's claim that a proper objection was not made, as required by Fed. R. Crim. P. 30, to the willful blindness instruction after the charge was given and before the jury retired for deliberations. At the close of his instructions the court asked if there were any objections to the charge. The following colloquy then took place: MR. McMAHON: Your Honor, the defendant is satisfied with the exception of the willful blindness charge and his objections have been duly recorded in two of my memorandums. THE COURT: Well, you're required to make them again now after it's given. -7- 7 MR. McMAHON: I'm making them now. THE COURT: All right. That objection is overruled. Rule 30 explicitly states in pertinent part: No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection. Despite being warned by the court, defense counsel did not state the grounds of the objection. The case law in this circuit requires strict compliance with the words of the Rule: As we have repeatedly held, Fed.R.Crim.P. 30 means what it says. A party may not claim error in the judge's charge to the jury unless that party "objects" after the judge gives the charge but before the "jury retires," and, when objecting the party must "stat[e] . . . distinctly the matter to which that party objects and the grounds of that objection." United States v. Wilkinson, 926 F.2d 22, 26 (1st Cir. 1991). ______________ _________ That the grounds for the objection were filed in writing with the court prior to the time the charge was given, matters not a whit. See United States v. Coady, 809 F.2d 119, 123 (1st ___ _____________ _____ Cir. 1987). In a recent civil case, Poulin v. Greer, 18 F.3d ______ _____ 979, 982 (1st Cir. 1994), we discussed at length the consequences of failing to follow the strictures of Fed. R. Civ. P. 51, which is identical to Fed. R. Crim. P. 30. We pointed out that failure to object after the charge -8- 8 "constitutes waiver of the objection." Id. We also noted ___ that the rule was binding on both the court and attorney and that a statement by the court "'after the charge that objections made prior to it will be saved does not absolve the attorney from following the strictures of the rule.'" Id.(quotingMcGrath v.Spirito,733 F.2d967, 969(1stCir. 1984)). ___ _______ _______ The failure of defendant to follow the command of Rule 30 means that our review is limited to plain error. Poulin, 18 F.3d at 982; United States v. Latorre, 922 F.2d 1, ______ _____________ _______ 10 (1st Cir. 1990). Defendant took the position at trial that he was "never told what was going on with this scheme." He further testified that he believed the information that was provided him about the properties was true. Such a claim cries out for a willful blindness instruction, when there is evidence to the contrary, as there was in abundance here. See infra at 3-4. ___ _____ The trial court may instruct the jury concerning willful blindness when a defendant claims a lack of knowledge, the facts support an inference of defendant's conscious course of deliberate ignorance, and the instruction, taken as a whole, cannot be misunderstood by a juror as mandating the inference of knowledge. United States v. Brandon, 17 F.3d 409, 452 (1st Cir. 1994); _____________ _______ United States v. Jones, 10 F.3d 901, 906 (1st Cir. 1993). _____________ _____ Viewed in the perspective of plain error, we find that it was not plain error to give a willful blindness instruction and that the form of the instruction was not plainly erroneous. -9- 9 SENTENCING SENTENCING __________ After a lengthy sentencing hearing the court allowed a two-level decrease under U.S.S.G 3B1.2(b), finding that defendant was a minor participant in the offense. This was not recommended in the presentence report. Defendant's adjusted offense level was 19. Because he was in Criminal History Category I, the applicable imprisonment range was 30 to 37 months with a supervised release range of 24 to 36 months. The fine range was $6,000 to $60,000. The maximum restitution figure was $1,266,883.75. The special assessment was $50 for each of the eight counts for a total sum of $400.00. The sentence given was: 30 months imprisonment; 24 months of supervised release; no fine was assessed; restitution in the amount of $40,000 was ordered, and a special assessment of $400 was levied. Defendant claims that the sentence was incorrectly calculated for two reasons: the court failed to consider U.S.S.G. 1B1.3(a)(1); and it failed to allow a downward departure under U.S.S.G. 2F1.1. We find that defendant's sentencing error claims are barred for procedural reasons. We start with the court's alleged failure to consider U.S.S.G. 1B1.3(a)(1). This guideline provides: (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise -10- 10 undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense; Defendant argues that in sentencing, as opposed to determining conviction, a co-conspirator defendant is responsible only for those acts which were reasonably foreseeable by him. This is undoubtedly correct. See United ___ ______ States v. Balogun, 989 F.2d 20, 22 (1st Cir. 1993). And it ______ _______ is clear that the district court did not consider U.S.S.G. 1B1.3(1)(B) in sentencing defendant. But it is also clear that the court was never asked to consider this guideline at the sentencing hearing or prior to it. The initial presentence report determined the loss due to charged conduct to be $1,061,264.00. The revised presentence report, made in response to objections by the government, included losses due to uncharged conduct which increased the loss to $1,266,883.75. There was no objection by defendant to the original presentence report. At the sentencing hearing defense counsel was asked by the court if he had any objections to the proposed revision of the presentence report. His response was: "No, your Honor, not -11- 11 from the defendant." We have read the record of the sentencing hearing carefully; defense counsel never mentioned or alluded to U.S.S.G. 1B1.3(1)(B). "We do not review sentencing guideline disputes which were not preserved before the district court." United ______ States v. Shattuck, 961 F.2d 1012, 1015 (1st Cir. 1992). ______ ________ "Time and again we have held that facts stated in presentence reports are deemed admitted if they are not challenged in the district court." United States v. Bregnard, 951 F.2d 457, _____________ ________ 460 (1st Cir. 1991); see also United States v. Dietz, 940 ___ ____ _____________ _____ F.2d 50, 55 (1st Cir. 1991). There are, therefore, no appealable grounds for us to consider the application of U.S.S.G. 1B1.3(a)(1). Defendant relies on Balogun for his contention that the _______ sentence be remanded for the district court to consider the guideline. But Balogun makes it evident that the defendant _______ in that case raised the question of the applicability of U.S.S.G. 1B1.3(a)(1) in the district court. Balogun, 989 _______ F.2d at 22. Defendant fares no better on his argument that the court should have departed downward under the authority of U.S.S.G. 2F1.1, Commentary 10, which provides: In a few instances, the loss determined under subsection (b)(1) may overstate the seriousness of the offense. This may occur, for example where a defendant attempted to negotiate an instrument that was so obviously fraudulent that no one -12- 12 would seriously consider honoring it. In such cases, a downward departure may be warranted. We will assume that by referring to United States _____________ v. Gregorio, 956 F.2d 341 (1st Cir. 1992), which refers to ________ U.S.S.G. 2F1.1 at pages 344-45, defendant preserved this issue for appeal. We note that after referring to Gregorio, ________ defense counsel apparently shifted gears to argue for a downward departure under U.S.S.G. 5K2.0. The court made it abundantly clear during the sentencing hearing that it was fully aware of its power to depart downward on the amount of loss but would not do so. In fact, the court discussed the applicability of United ______ States v. Rivera, 994 F.2d 942 (1st Cir. 1993), which ______ ______ discusses at length the power of the district court to impose a sentence that departs from the sentencing guidelines. Under such a scenario we have no jurisdiction to consider the court's refusal to depart downward (or upward). United ______ States v. LeBlanc, No. 93-1847, slip op. at 18 (1st Cir. May ______ _______ 24, 1994) (as a general rule decision not to depart is not appealable); United States v. Gifford, 17 F.3d 462, 473 (1st _____________ _______ Cir. 1994) (no appeal from district court's discretionary decision not to depart from guidelines); United States v. ______________ Sepulveda, 15 F.3d 1161, 1202 (1st Cir. 1993) (a sentencing _________ judge's informed decision not to depart is a non-appealable event). -13- 13 The judgment below is Affirmed. Affirmed. _________ -14- 14